# CITY NATIONAL BANK OF FORT WORTH *v.* HUNTER.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF TEXAS.

No. 116. Submitted December 10, 1888. — Decided March 5, 1889.

On the proofs which are reviewed at length in the case stated by the court, *Held*, that the agreements between the parties of March 20, 1880, were so far consummated that neither party to this suit can insist upon superiority of lien as between themselves; that no case of misrepresentation of facts as distinguished from matters of opinion is made out to warrant declaring the agreements null and void; that the execution and delivery of his note by Dawson and the delivery of the cattle to him, and O'Neal's bill of sale consummated the written agreement so far as he was concerned; that the action of appellants in commencing suit against Dawson and O'Neal, and in taking possession of the cattle was unjustifiable, and that Dawson may recover his damages thereby suffered by way of reconvention in this suit; that the original bill for foreclosure having been amended so as to be in the alternative, seeking the ascertainment of the indebtedness of O'Neal to complainants and the payment of their share of the proceeds of the cattle, the bill should be retained and go to decree; that the *pro rata* proportions of indebtedness were incorrect; that the appellant is not so situated as to be entitled to set up an estoppel in this respect; that the proportions in which the fund should be divided between the parties should be determined as of the date that Dawson paid the money into the bank; that the laws of Illinois govern as to the rate of interest; and that, as the decree was severable in fact and in law, and as O'Neal's estate (he having deceased) had no concern with the matters complained of by the bank and by Dawson, they were entitled to prosecute their appeal without joining O'Neal's administratrix, who did not think proper to question the judgment.

IN EQUITY. The Fort Worth Bank and Dawson, respondents, took an appeal from the final decree. The case, as stated by the court in its opinion, was as follows:

In February, 1879, Hunter, Evans & Co. engaged in the live-stock commission business at East St. Louis, Illinois, made an arrangement with John O'Neal, who resided in Van Zandt County, Texas, and was buying and shipping cattle from different points in that State, by which they were to furnish O'Neal money to buy cattle during the spring and summer of that year, to be consigned to them for sale. The dealings between them resulted in an indebtedness to Hunter, Evans & Co. to a considerable amount, and on the 20th day of August O'Neal executed two notes for $11,000 each, payable to Hunter, Evans & Co., and as security for their payment gave them a bill of sale on his O N brand of cattle, further described as being his home stock of cattle, and on the same day and as part of the same transaction, Hunter, Evans & Co. executed and delivered to O'Neal a defeasance providing for the cancellation of the bill of sale when the notes were paid. It seems to be conceded that this chattel mortgage was never properly recorded in accordance with the statute of Texas, which provided that every chattel mortgage not accompanied by immediate delivery and followed by an actual and continued change of possession of the property mortgaged or pledged, should be absolutely void as against subsequent purchasers and mortgagees or lien holders in good faith, unless such instrument or a true copy thereof were forthwith filed in the office of the county clerk of the county where the property should then be situated. While O'Neal was conducting his business with Hunter, Evans & Co., he obtained money from the City National Bank of Fort Worth, which was repaid by drafts drawn on Hunter, Evans & Co. either by O'Neal or by Wm. Hunter, the agent of Hunter, Evans & Co., which were duly honored by the latter, except one draft dated November 15, 1879, for $9354.03, payment of which was refused, whereupon, on the 10th day of December, 1879, O'Neal gave his note to the bank for $9810.11, the amount of said draft and interest, and executed a mortgage as security on his home stock of cattle branded O N, subject to the bill of sale to Hunter, Evans & Co., and also of his cattle branded H, and H I, and one hundred head of horses, mares and colts branded O N,

which mortgage was recorded by the· county clerk of Van Zandt County, December 16, 1879.

It is testified by the vice-president of the bank that the agent of Hunter, Evans & Co. agreed with the bank that if it would honor O'Neal's checks he would guarantee their payment, and settle O'Neal's accounts at any time by a draft on Hunter, Evans & Co., in case O'Neal was not in Fort Worth to give the draft himself, and that the credit was extended ·to O'Neal on the strength of said guaranty ; that on the day the draft for $9354.03 was drawn he asked Hunter if it would .be paid by Hunter, Evans & Co., and whether or not witness had better take a bill of lading, which would insure the payment of the draft, or hold the cattle, to which Hunter replied that Hunter, Evans &.Co. were obliged to pay the draft, and would do it ; and that, relying on that statement, witness did not take a bill of lading, but allowed the draft to take its course, and on that day left Fort Worth and was absent some weeks, and hence was not in Fort Worth when the draft was protested, nor present when the note and· bill of sale were executed by O'Neal to the bank. William Hunter, the agent of Hunter, Evans & Co., denied that they bound themselves to pay O'Neal's indebtedness to the bank in any way whatever. Early in the year 1880, one John Dawson proposed to purchase a part of ·O'Neal's cattle and drive them to a place outside of Texas, to fill a contract of sale he had made with other parties to deliver cattle at the Ponca Agency· in the Indian Territory, by the 20th day of June, 1880, and agreed with O'Neal upon the purchase; but before this trade could be consummated, it was necessary for Dawson to have the consent of the lien holders, and accordingly he consulted Hunter, Evans & Co. and the officers of the bank, who agreed that the sale might be made.

On the 20th of March, 1880, O'Neal and his attorney, William Hunter for Hunter, Evans & Co. and their attorney, the vice-president of· the City National Bank and its attorney, and Dawson met at Fort Worth, Texas, and three different agreements in writing were executed between the parties. One was between John M. Dawson, Hunter, Evans & Co.·

and the bank, and recited the existence of indebtedness and liens, and the fact that O'Neal had contracted for the sale of the cattle to Dawson, as shown by a written contract, by the terms of which Dawson was to assume the payment of O'Neal's indebtedness to Hunter, Evans & Co. and the bank, provided sufficient cattle be delivered by O'Neal to Dawson for the purpose; that in the event that the cattle sold and delivered by O'Neal to Dawson should be insufficient to discharge the amount of the indebtedness in full, then Dawson assumed to pay off and discharge the indebtedness *pro rata*, to the extent of the cattle received, payment to be made by Dawson to Hunter, Evans & Co. and the bank by October 1, 1880; the sale was stated to be subject to the liens, and the cattle were to be held in trust for Hunter, Evans & Co. and the bank; that Hunter, Evans & Co. and the bank together should select a man to accompany Dawson from Texas to the point where the cattle might be sold, and this man was to have the legal possession of the cattle and receive the proceeds of the sale; if Dawson did not sell the cattle by the first of October, 1880, then Hunter, Evans & Co. and the bank might retake the cattle and dispose of them, and apply the proceeds thereof. Dawson was to have the handling, control, and disposition of the cattle, subject to the provisions of the agreement.

Another of the agreements was between Hunter, Evans & Co., the bank, and O'Neal, whereby Hunter, Evans & Co. and the bank agreed to the sale of the cattle by O'Neal to Dawson, provided O'Neal should, upon the delivery of the cattle to Dawson, surrender to Hunter, Evans & Co. and the bank the proceeds of the sale, consisting of Dawson's paper, together with the contract of sale; and Hunter, Evans & Co. and the bank agreed to receive such paper and contract in discharge of their respective claims upon O'Neal, provided such proceeds equalled the amount of the indebtedness to Hunter, Evans & Co. and the bank; and if such proceeds should be less than said indebtedness, Hunter, Evans & Co. and the bank agreed to divide the same *pro rata*. If there should be a deficiency, O'Neal obligated himself to make it good in cash or notes secured to the satisfaction of Hunter Evans & Co. and the

bank, by giving deeds of trust on real and personal property. If there arose a dispute as to the amount O'Neal owed either party, then the amount agreed to be due should be adjusted and discharged, and the amount in dispute should be secured by O'Neal as aforesaid; and when the dispute should be settled, the amount thereof should be paid from said proceeds of sale or said security furnished by O'Neal. Should there be a deficiency, it was to be " carried owned and held between the said Hunter, Evans & Co. and the said City National Bank, according to their respective claims, and the collection arising therefrom to be pro rated" between them. If the agreement, " from any cause whatever, fail to be carried out and consummated, then no statement or recital herein shall be construed to be an abandonment of any right, lien, or security held by any of the parties hereto."

It was further agreed by O'Neal that should there be a deficiency he would secure it in manner aforesaid, and it was to bear interest at the rate of twelve per cent per annum from date, and to mature on or before the first day of January, 1881, the deficiency to be secured at the time said cattle were delivered to Dawson.

The other agreement was between Dawson and O'Neal, reciting that whereas Hunter, Evans & Co. and the bank had liens on the cattle; and whereas O'Neal, Hunter, Evans & Co. and the bank had agreed to sell the cattle to Dawson at the prices in said agreement mentioned; and whereas Hunter, Evans & Co. and the bank had agreed with Dawson upon the time and place of payment for said cattle to the amount of their debt, or so much thereof as said cattle might bring, and also upon the manner and amount of security for said payment by said Dawson; therefore O'Neal, in consideration of the enumerated agreements, " both of which bear even date herewith and are made parts hereof," and the further consideration of the release of said indebtedness to Hunter, Evans & Co. and the bank, agreed " to gather and deliver to the said John Dawson, at or near Will's Point in Van Zandt County, my stock of cattle, consisting of cows, calves, yearlings, and two, three and four year olds and upwards, upon which said

Hunter, Evans & Co. and said City National Bank have liens, together with such other of my cattle as I may want to put in said sale and as may be acceptable to said Dawson, at the following prices," giving them. Dawson bound himself to pay for the cattle at the rate fixed, " in such way and such manner as the said Hunter, Evans & Co. and the said City National Bank may require, and payable to them," as per agreement between Hunter, Evans & Co. and the bank and Dawson.

If the cattle should amount to more than the amount of the indebtedness to Hunter, Evans & Co. and the bank, then Dawson for the excess agreed to give O'Neal security payable not longer than October 1, 1880, with interest at twelve per cent. It was further agreed that the cattle were to be delivered to Dawson on or before May 20, 1880.

The papers having been executed, O'Neal proceeded to gather the cattle for delivery to Dawson, and Dawson prepared to receive them, both incurring considerable expense in so doing, and on the 22d day of May, 1880, the gathering of the cattle was completed near Will's Point, at which place, on that day, Dawson, O'Neal, L. W. Evans, agent of Hunter, Evans & Co., the attorney of that firm, the attorney of the bank, and the attorney of O'Neal, and Gen. Henry E. McCulloch, the agent who had been selected and appointed by the bank and Hunter, Evans & Co. to accompany the drive and receive from Dawson for them the proceeds of the sale of the cattle, assembled. The cattle consisted of 1741 head, mostly branded O N, and their value at the contract price was $19,033. Hunter, Evans & Co. claimed that O'Neal owed them about $18,000; O'Neal disputed all of said claim except $9915.74. The debt of the bank on that date was admitted to be $10,-339.85. The attorney of Hunter, Evans & Co. wrote a note for Dawson to sign for the purchase money, which he did. It read as follows:

" $19,033. WILL's POINT, TEXAS, *May* 22, 1880.

" One day after date, for value received, I promise to pay to the order of Hunter, Evans &. Co. and the City National Bank of Fort Worth, Texas, at Fort Worth, Texas, the sum

of nineteen thousand and thirty-three dollars, with interest at the rate of ten per cent per annum from date until paid. This note is to be paid according to the terms and stipulations contained in a written contract entered into by and between John Dawson, Hunter, Evans & Co., and the City National Bank of Fort Worth, and dated March 20, 1880.

"J. M. DAWSON."

The note was handed, by direction of the bank and Hunter, Evans & Co., to General McCulloch.

The cattle were delivered to Dawson by O'Neal with the knowledge and consent of Hunter, Evans & Co. and the bank, and were driven by Dawson through Will's Point to a point three miles west of the town; and on the same day Dawson sold, for cash, cattle to the amount of $3419, which he paid over to McCulloch, who indorsed upon the note the following:

"Received on the within note three thousand four hundred and nineteen dollars: ($3419.)    May 22, 1880.

"HENRY E. McCULLOCH, Agent."

Upon the basis of the undisputed claims the attorneys of the bank and of Hunter, Evans & Co. figured out the proportions in which the amount of Dawson's note should be distributed, and ascertained that of said note the bank was entitled to receive $9715.78 and Hunter, Evans & Co. the remainder, $9317.22, and both of them instructed General McCulloch, that of every one thousand dollars paid in by Dawson he should send Hunter, Evans & Co. $482.52 and the bank $510.48. The $3419 were then and there divided and paid over to said parties in that proportion, and the bank's attorney indorsed O'Neal's note to the bank with a credit of $9715.78 as "assumed by John Dawson," while a receipt was given to O'Neal by the attorney of Hunter, Evans & Co. "showing that cattle to the amount of $9317.50 had been delivered to Dawson." There was no objection to the delivery of the cattle to Dawson, although before they were delivered there was a wrangle between O'Neal and the agent and the attorney of Hunter, Evans & Co. as to the true amount of the indebt-

edness of O'Neal to that concern, but, on the contrary, the attorneys of the parties told Dawson that the cattle were his and he could drive them to market ; and it appears to have been understood that he was going to drive them through Northwestern Texas and the Indian Nation to Kansas. Dawson and McCulloch went on with the cattle, getting out of Van Zandt County on the 23d or 24th of May, 1880, and soon after leaving Will's Point Dawson sold another lot of the cattle for something over $2000, receiving in part payment therefor a draft payable to Hunter, Evans & Co. for $1842, for which McCulloch entered on Dawson's note the following credit :

"Received on the within note a draft drawn by Frank Houstan for eighteen hundred and forty-two dollars, payable on the 22d day of next month. May 25, 1880.

"HENRY E. McCULLOCH, Agent."

This draft was sent by McCulloch to Hunter, Evans & Co., and at the same time McCulloch drew a draft upon them in favor of the City National Bank for its *pro rata* part of said payment, $939.88, but when the latter was presented to Hunter, Evans & Co. for their acceptance they declined to accept it and appropriated the whole of this payment.

On the 31st of May, 1880, Hunter, Evans & Co. began suit in the District Court of Montague County, Texas, by petition, against O'Neal and Dawson, claiming to have a lien upon the stock of cattle then in the possession of John Dawson, in said county of Montague, which lien they charged existed by virtue of a mortgage given them upon said stock of cattle by O'Neal, and sued out a writ of sequestration by virtue of which the sheriff of Montague County took into his possession the property described in the petition and writ, to wit, fourteen hundred and seventy-eight head of cattle of the aggregate value of $15,614.

The seizure was made on the 2d day of June and the cattle retaken by Dawson under a replevin or forthcoming bond on the 6th day of June. The bank furnished Dawson the securi-

ties on his bond, and when he sold the cattle afterwards he paid the amount of his note and interest into the bank, which has ever since held the same to await the result of this suit.

On the 21st day of June, 1880, Hunter, Evans & Co. sued out a supplemental writ of sequestration directed to Van Zandt County, under which about 247 head of cattle were seized, and of these O'Neal replevied a few cows and calves valued at $110. On the 28th day of December, 1880, the cause was removed into the United States Circuit Court for the Northern District of Texas, at Dallas. O'Neal appeared first in the state court and pleaded to the jurisdiction, which plea was pending when the record was filed in the United States court. In 1881 the City National Bank of Fort Worth entered its appearance as a defendant. Both parties then, by leave of court, amended their pleadings. Hunter, Evans & Co. in their amended bill set up their dealings with O'Neal and the execution of the bill of sale and defeasance, and claimed that O'Neal owed them $18,616.49, February 1, 1880, on which they received during that month from the Texas and Pacific Railroad Company $625, and on the 22d day of May, 1880, from H. E. McCulloch, $1668.56; that O'Neal gave a mortgage to the bank subject to their lien, but the bank, in February, 1880, claimed that its lien was superior to that of Hunter, Evans & Co., and threatened to litigate said question; that at that time the O N stock of cattle could not be gathered except at ruinous expense and great trouble, and Hunter, Evans & Co. knew that, pending litigation about them, the cattle while on the range would become worthless by straying off and being stolen and sold by other parties, and to avoid such litigation, expense, and loss of said cattle, Hunter, Evans & Co. entered into two certain agreements dated March 20, 1880, the two being in fact but one, the substance of which they proceeded to state. Complainants then stated the meeting at Will's Point on May 22d, and said that, without notice to them, O'Neal delivered to Dawson stock of the value of $19,033, of which cattle to the amount of $3419 were sold and the proceeds paid to McCulloch, who had been selected by Hunter, Evans & Co. and the bank to accompany the cattle, of which

amount complainants received $1668.38 and the bank the balance; that after the cattle were delivered O'Neal for the first time disputed over $8700 of his indebtedness to complainants; that O'Neal made to Dawson a bill of sale for said cattle, and Dawson executed his note to complainants and the bank for $19,033, and complainants and the bank gave O'Neal a receipt for said amount; that O'Neal then failed and refused to secure the disputed amount of complainants' claim against him; that "thereupon the parties to said agreement were remitted to their original rights and liens, and the said agreements thereby became abrogated and were thereafter of no force or effect;" and that complainants had since "treated said agreement as abrogated, abandoned and of no effect." They charged that O'Neal, Dawson and the bank confederated to cheat them, and that O'Neal at the time of the agreement in March represented that he owned a large number of cattle included in the bank's lien but not in complainants', and that if complainants would enter into said agreement said cattle should be embraced therein and included in the delivery to Dawson; that complainants, relying on the representations which were adopted by the bank, were induced to enter into the agreement with O'Neal, Dawson and the bank, but the representations were false and known to be so by the parties; that O'Neal frequently acknowledged that $16,300 of complainants' claim was correct, and promised to meet complainants after said agreements and fix the amount of the indebtedness but did not do so, and after the cattle were delivered to Dawson, then for the first time disputed $8500 of complainants' claim; that he proposed to pay complainants something over $4000 in addition to the amount assumed by Dawson, but complainants rejected that proposition; and that complainants tried to obtain arbitration without effect, and O'Neal finally said that he had no property with which to secure his indebtedness to complainants, that his property was mortgaged, etc.; that O'Neal was hopelessly insolvent when he delivered said cattle to Dawson, and after said delivery owned no other cattle except about 300 head of said O N stock, not exceeding the value of $3000, and included

in complainants' bill of sale; that O'Neal's acts and represen-tations, after the delivery to Dawson, were with the view to delay complainants while Dawson hurriedly proceeded to drive the cattle out of Texas with fraudulent purpose; that all the cattle delivered by O'Neal to Dawson belonged to the O N stock and were included in the complainants' bill of sale, and he did not deliver to Dawson any cattle of the other marks and brands mentioned in the bank's mortgage; that long after the execution of the bill of sale to complainants, O'Neal, without complainants' knowledge or consent, sold cattle to the amount of $3000 and converted the amount to his own use; that on account of the deceit and fraud of O'Neal, Dawson and the bank, the said agreements of March 20, 1880, are null and void; that Dawson failed to account to McCul-loch for $218; that he disposed of part of the stock and re-ceived in exchange about thirty head of yearlings, and was proposing to dispose of them without accounting when stopped by the levy of the writ of sequestration; and that after Daw-son replevied said cattle he sold them for $16,500, and now holds that amount.

Complainants prayed a decree against O'Neal for the full amount of their debt against him and for a foreclosure of their lien against O'Neal, Dawson and the bank; and, if mistaken as to their remedy, they prayed for a decree against Dawson and the bank for the amount of money coming to them from the proceeds of said cattle under and by virtue of said agree-ments, and for general relief.

O'Neal, in addition to his plea to the jurisdiction, answered by a general denial, and further, that the notes held by com-plainants were simply executed to secure a margin of credit from complainants; and that complainants' claims were full of incorrect items, which he specified and which amounted to many thousand dollars.

The bank and Dawson filed joint and several answers, set-ting up the execution by O'Neal to the bank, on the 10th of December, 1879, of his note for $9810.11, secured by mort-gage on his home stock of cattle, branded H and O N, includ-ing horses, mares and colts; that the bills of sale to Hunter,

Evans & Co. and the bank were intended to be mortgages; that Hunter, Evans & Co. knew better than the officers of the bank what O'Neal's financial condition was, and in all their transactions relied on their own knowledge of him and his property; that it was at the special instance and request of complainants that the bank advanced O'Neal the money out of which his indebtedness to it grew, and complainants promised to pay the same; that the bank did intend to institute suit for the purpose of deciding the validity and priority of its own and complainants' liens; that they believe the motives of Hunter, Evans & Co., in entering into said agreements, were the knowledge that they had not in fact a debt against O'Neal of the amount claimed by them, and knew they were primarily liable to the bank for the payment of its debt against O'Neal, and because by entering into said agreements they would escape from responsibility to the bank and from a controversy with the bank as to the validity of their lien, and obtain an equal lien on property they had no lien upon before, and would without surrendering the disputed amount of their debt against O'Neal effect a collection without loss of the uncontested part; that the reservation in said agreement, that if it should fail to be carried out and consummated, then no statement or recital therein should be construed " to be an abandonment of any right, lien, or security held by any of the parties hereto," applied only to the consummation of the pending transaction; and that when the sale from O'Neal to Dawson was perfected by delivery, on the 22d of May, 1880, said agreement took final effect. The circumstances attending the execution of the agreements and the transactions at Will's Point, the execution of Dawson's note, payments made on it, etc., were set out, and defendants said that the objects of the two agreements between O'Neal, the bank and Hunter, Evans & Co., and Dawson, the bank and Hunter, Evans & Co., were double — one was to sell the cattle to Dawson free from every lien before existing against them, but charged with a new lien or trust, to be enforced through the agency of H. E. McCulloch; the other to obtain a settlement between some, but not all, of said parties; and therefore all of the provisions of one are not

provisions of the other agreement; that by the agreement of March 20, 1880, and the purchase of the cattle by Dawson, the original liens of complainants and the bank on the cattle sold Dawson were extinguished, and said new lien substituted therefor; that complainants knew before the delivery of the cattle to Dawson the exact amount of their debt that was disputed by O'Neal; that Dawson used despatch in driving the cattle, because, as was known to complainants, he purchased them to fulfil contracts of sale previously made by him, and he commenced with the knowledge and consent of complainants to drive said cattle to their destination out of the State of Texas; that at the date of the delivery to Dawson, O'Neal owned a large number of cattle, not included in the sale and delivery to Dawson, which he offered to deliver upon the same terms and for the same purpose, if the time required for their being gathered was allowed, but complainants agreed that the cattle then gathered should be delivered; that at the time of the delivery to Dawson, O'Neal owned of the O N stock on the range in Van Zandt County, besides those delivered to Dawson, as many as 350 head, of the value of $5250, as complainants well knew, and which were seized a few days afterwards by a writ of sequestration, wrongfully sued out by complainants; that O'Neal was solvent at the time of the sale and delivery to Dawson, and offered to secure Hunter, Evans & Co. by mortgage, which was not executed, because they required a power of sale for cash in ten days after the amount in dispute had been settled; that O'Neal was always ready to give complainants security, but they refused to take it, uncoupled with the authority to foreclose at once; that the cause of the failure of negotiations between complainants and O'Neal was that complainants had conceived the purpose of seizing Dawson's property under such circumstances as they believed would lead to its being surrendered to them by Dawson rather than suffer the damages, delays and losses which might otherwise ensue; that the officers of the bank and Dawson did nothing at any time with the view to deceive or injure complainants in any way; and if O'Neal had any such purpose he did not communicate it to either of them, but they believed

and had every reason to believe that O'Neal was acting with the utmost good faith towards complainants. They denied that the bank or its officers, previous to the date of. the agreement, had any knowledge of the number, value, or situation of O'Neal's cattle other than O'Neal's statements to them. They said they never pretended. or represented to complainants, or either of them, or any agent of theirs, that said bank, or any of its officers, or agents, had any such knowledge, and they denied that they, or either of them, deceived complainants, or either of them, or caused them to be deceived in any respect. They denied all collusion to get possession of the stock of cattle or to have said agreement executed before a final settlement between O'Neal and complainants. They denied that Dawson ever disposed of any of the cattle otherwise than he was authorized to do by said agreement and as the owner thereof, and that they had deceived McCulloch in any respect. They averred that complainants purposely failed to make the bank a party to their suit in Montague County, and brought said suit there. in a court which had jurisdiction neither of the property nor of the persons of the defendants.

Defendant Dawson charged that complainants, by their wrongful seizure of said cattle by the writ of sequestration, subjected him to great expense, loss and damage, which he specified, and asked to have allowed by way of reconvention, and that he had been damaged by reason of the malicious suing out of said writ of sequestration in. the further sum of $10,000, for which he asked punitive damages.

On the 18th day of May, 1885, the court overruled the defendants' exceptions and O'Neal's piea to the jurisdiction and entered a decree that Dawson's note be divided between complainants and the bank *pro rata* according to their actual demands against John A. O'Neal; that on May 22, 1880, O'Neal was indebted to the complainants in the sum of $18,333.68 and to. the bank in the. sum of $10,339.85; that complainants were entitled at said date, out of the Dawson note, to the sum of $12,169.64, less the sums received by them from the proceeds of said note, to wit, the sum of $1668.69, paid May 26, 1880, and the sum of $1842, paid June· 26, 1880,

with interest from May 22, 1880; that Hunter, Evans & Co. recover from Dawson and his sureties the sum of $8659.15 principal and $4329.67 interest, making a total of $12,988.82, with interest from date of decree at the rate of ten per cent, and costs; that complainants had received the sum of $2424.56 in the value of cattle sequestered herein and replevied by complainants, of which sum the bank was entitled to $1311.50; and that the bank recover of complainants said sum, with execution. It further appearing that O'Neal replevied $110 worth of cattle sequestered on the 20th of July, 1880, it was decreed that complainants recover of Mary O'Neal, administratrix, and the sureties of O'Neal on the replevin bond, $110, with interest at eight per cent per annum from July 20, with execution, the proceeds of said collection to be distributed *pro rata* between complainants and the bank; that complainants recover of and from the estate of O'Neal, to be paid in the due course of administration, the sum of $4613.81 and costs, less any sum or sums received by complainants from the execution to be issued against O'Neal's sureties; and that in the meantime the costs of this suit be paid by complainants and the bank *pro rata.*

*Mr. A. S. Lathrop* for appellants.

*Mr. Sawnie Robertson* for appellees.

Mr. Chief Justice Fuller delivered the opinion of the court.

The action of the parties at Will's Point on the 22d day of May, 1880, so far carried out and consummated the agreements of March 20th, that neither the bank nor Hunter, Evans & Co. could thereafterwards insist upon superiority of lien as between themselves; and we are satisfied, upon a careful review of the evidence, that Hunter, Evans & Co. were not entitled to rescind the agreements or treat them as annulled on the ground of fraud in the obtaining of their execution.

Many circumstances are clearly made to appear which

rendered it natural for Hunter, Evans & Co. to desire to make just such agreements as they did make, and are inconsistent with the theory that they did not act with their eyes open.

Although they claimed a first lien upon the larger part of the cattle in question, yet this was contested by the bank on the ground of the invalidity thereof under the statute, as against its mortgage. And while it is denied on the part of Hunter, Evans & Co., the evidence of the vice-president of the bank is explicit to the effect that the line of credit extended to O'Neal by the bank was on the strength of the agreement of William Hunter to guarantee the payment of O'Neal's drafts; and that, as to the particular draft which created the indebtedness due the bank, the bank neglected to take a bill of lading because it relied on the statement of Hunter that the draft would be honored. Questions such as these demanded solution, and it is not to be wondered at that Hunter, Evans & Co., as they say in their bill, to avoid "litigation, expense and loss," entered into these contracts. Again, a portion of his alleged indebtedness to Hunter, Evans & Co. had always been disputed by O'Neal. O'Neal had more cattle than those named in the bill of sale to Hunter, Evans & Co.; was believed to have other property; and there is considerable evidence tending to show that his financial condition need not have been rendered as desperate as it subsequently apparently became. It was desirable that the cattle should be sold, and the sale to Dawson was agreeable to both Hunter, Evans & Co. and the bank, if an agreement could be made in respect to the proceeds.

In the light of these circumstances, it would require a strong case of definite misrepresentation as to facts, as distinguished from mere matters of opinion, to be made out before these agreements could be declared null and void.

Complainants aver, in substance, that O'Neal represented that he owned a large number of cattle not in the O N brand, then running in the range in Van Zandt County, which were not included in the bill of sale to Hunter, Evans & Co., but were included in the bank's mortgage, and which were "quite or very nearly sufficient in value to pay the said O'Neal's indebtedness to the said bank," and that they were induced to

enter into said agreements in reliance on said representations, which were false.

But we think the evidence fairly preponderates that no such statements were made, and certainly not to the bank's knowledge, and that the testimony to the contrary is given under a misapprehension arising from O'Neal expressing his belief that he had cattle enough in all to pay both debts. And this inference is heightened by the fact that the tendency of the evidence is to establish that William Hunter, the agent of Hunter, Evans & Co., was acquainted with O'Neal's cattle, and must have known that they were principally of the O N brand. If the contention that O'Neal fraudulently disputed so large a part of the claim of Hunter, Evans & Co. against him, and then fraudulently refused to secure the disputed amount, were sustained by the evidence, neither the bank nor Dawson should be held bound by such conduct on his part without convincing proof that they participated or acquiesced in such fraud. And it would have been the duty of Hunter, Evans & Co., if they designed to attempt to set up fraud in these particulars, to have refused to go forward in consummation of the agreements on the 22d day of May at Will's Point.

When the parties met there on that day, O'Neal and Dawson having been in the meantime put to a large expense on the strength of the agreements, in gathering and caring for the cattle when and as gathered, the amount due from O'Neal to Hunter, Evans & Co. had not been determined, and O'Neal insisted that their account was erroneous to the extent of between eight and nine thousand dollars. The undisputed portion of the claim was finally set at $9915.74. The debt due the bank was admitted to be $10,339.85, and the price to be paid for the cattle by Dawson, $19,033. The attorneys of the bank and Hunter, Evans & Co. proceeded to ascertain what the *pro rata* shares in the $19,033 of the bank and Hunter, Evans & Co. would be, and placed the bank's at $9715.78 and Hunter, Evans & Co.'s at $9317.22, these being the proportions that the undisputed debt due the bank of $10,339.85 and the undisputed debt of $9915.74 due to Hunter, Evans & Co. were respectively entitled to receive.

McCulloch had been selected as the. party to accompany Dawson "in driving said cattle from Texas to any point said cattle may be sold," to "have the legal possession of said cattle," and to "receive the proceeds of the sale of said cattle from any and all purchasers of said cattle to the extent and amount of said indebtedness assumed by said Dawson," namely, inasmuch as the value of the cattle delivered to Dawson was not equal to the amount of the indebtedness, "*pro rata* to the extent of the cattle received." The undisputed debts due to Hunter, Evans & Co. and the bank, the price of the cattle and the proportions in which the proceeds were to be distributed, having been arrived at, Dawson signed and delivered the note for $19,033 ; O'Neal executed an absolute bill of sale to him ; the cattle were delivered ; and McCulloch and Dawson started on the drive, it being understood that the cattle were to be driven to market beyond the boundaries of the State. On the same day Dawson sold cattle to the amount of $3419, which was receipted for on the note by McCulloch, and which was divided *pro rata* between Hunter, Evans & Co. and the bank, as agreed upon by their representatives at the time; Hunter, Evans & Co. receiving $1668.56. On the 25th of May McCulloch received from further cattle sold a draft for $1842, payable June 22d, which, being payable to Hunter, Evans & Co., was remitted to them ; but McCulloch at the same time drew a draft on Hunter, Evans & Co. in favor of the bank for the bank's share, according to the proportion agreed upon, namely, $939.88, McCulloch having been instructed by the attorneys that of every one thousand dollars received he should send Hunter, Evans & Co. $482.52 and the bank $510.48.

In our judgment the execution and delivery of his note by Dawson, and the delivery of the cattle to him, and O'Neal's bill of sale, constituted, under the circumstances, the consummation of the written agreement so far as he was concerned. The cattle belonged to Dawson, subject to being retaken by Hunter, Evans & Co. and the bank, if Dawson did not sell them by the first of October. All that remained for Dawson to do was to sell the cattle and pay over the proceeds to McCulloch until his note was extinguished.

It may be conceded that Hunter, Evans & Co. supposed on the 22d of May that O'Neal would be able to secure the balance due, but Dawson did not agree, as we view the transaction, that O'Neal should do so, nor was there any reason why he should, if he paid the price agreed upon for the cattle. The controversy, if any, between the other parties, would be transferred to the proceeds.

What they all desired and what they all agreed upon was a sale of the cattle for their value, and the collection of the proceeds of such sale, and this was effected in the manner stated by the arrangement with Dawson, who, however, was under no obligation after the cattle were delivered to him, except to account for their proceeds to the amount of the note he had given, or surrender them in case of failure to realize before October 1st.

We regard the action of Hunter, Evans & Co., in commencing suit on the 31st day of May, in the District Court of Montague County, against Dawson impleaded with O'Neal, and taking possession of Dawson's cattle by writ of sequestration, as unjustifiable, and hold that Dawson is entitled to recover such damages as he actually sustained, by way of reconvention, in this suit. We are asked to dismiss the bill altogether, and if it had remained, as originally filed, a bill for the foreclosure of the chattel mortgage given Hunter, Evans & Co., which mortgage had been in effect disposed of by the agreements of March 20th, that course might have been proper; but the parties repleaded, and the bill as amended being in the alternative, and seeking the ascertainment of the indebtedness of O'Neal to complainants, and the payment of their share of the proceeds of the cattle, we think it should be retained and go to decree, upon being remanded, in accord ance with the views herein expressed. The agreement between Hunter, Evans & Co. and the bank, and O'Neal, provided that, in case of any difference or trouble about the amount of the indebtedness of O'Neal to Hunter, Evans & Co., or the bank, the disputed amount, when determined by agreement, suit, arbitration or otherwise, should be paid from the proceeds of the sale to Dawson, or from security furnished

by O'Neal, and the Circuit Court held that when the amount of the claim of Hunter, Evans & Co. was determined in the suit, they should participate *pro rata* in the fund derived from Dawson's note, and from property of O'Neal realized upon outside of that.

As it is clear that O'Neal was liable for very much the larger part of the amount disputed by him, so that the *pro rata* proportions arrived at at Will's Point were incorrect, and as we do not perceive that the bank is so situated as to be equitably entitled, under all the circumstances, to insist, upon the principles of estoppel or otherwise, that the proportions, as then estimated, must necessarily remain unchanged, we are not inclined to challenge the conclusion reached by the Circuit Court in this regard.

It appears from the evidence that after Dawson replevied the cattle he sold them, and paid the balance due upon his note into the bank to abide the result of this suit, but at what date this deposit was made, and the exact amount of it, does not appear. The sums of $3419 and $1842 had already been paid upon the note, leaving a principal sum of $13,772; but the note bore ten per cent interest, which must be added down to the date of the payment into the bank. Upon a supplementary writ of sequestration, dated June 21, 1880, and directed to the sheriff of Van Zandt County, 247 cattle belonging to O'Neal were taken, of which he replevied 21 cows and calves, worth $110, and gave bond therefor July 17, and on the 20th of July the remainder of said cattle were delivered to Hunter, Evans & Co., being valued by the sheriff at $2424.56; Hunter, Evans & Co. giving bond in the penal sum of $5000. These cattle, it is testified to by O'Neal and Allen, were worth $15 a head, with the exception of a few calves, which were worth about $7 a head. Hunter, Evans & Co. sold 196 of them for $2141.50. The Circuit Court found their value to be that fixed by the sheriff, namely, $2424.56, and with that we are content. In the view which we take of the conduct of Hunter, Evans & Co. they are to be held to have received this $2424.56 July 20, 1880, and to account also for $110 as of July 17, 1880, leaving them to pursue for their own

benefit the sureties on O'Neal's bond. The fund, therefore, to be divided *pro rata* consists of the amount of the Dawson note, with such interest as accrued thereon down to the date of the payment by Dawson into the bank, and of the $2424.56 and of the $110.

As of what date shall the proportions in which this fund is to be divided between Hunter, Evans & Co. and the bank be ascertained? We believe it most equitable that this *pro rata* division should be determined as of the date that Dawson paid the money into the bank.

In arriving at the amount actually due from O'Neal to Hunter, Evans & Co., for the purpose of distributing the fund, we think the account attached to the bill may be treated as sufficiently shown by the evidence to be correct, with the exception of some of the interest charges, which are calculated at ten per cent and which ought not to be compounded. The rate of interest in the State of Illinois in 1879–80 was six per cent, but in all written contracts it was lawful for the parties to stipulate or agree that eight per cent per annum should be paid, and it was provided that any person or corporation who should contract to receive a greater rate of interest or discount than eight per cent should forfeit the whole of said interest so contracted to be received, and be entitled only to recover the principal sum. Revised Statutes Illinois, 1881, c. 74, p. 650.

In the State of Texas the rate of interest when no specified rate was agreed upon was eight per cent, which applied to open accounts from the first day of January after the same were made. The parties to any written contract might agree to and stipulate for any rate of interest not exceeding twelve per cent per annum. Revised Statutes of Texas, 1879, p. 433.

We agree with appellees' counsel that the statutes of Texas do not apply, and are of opinion that Hunter, Evans & Co. are entitled to receive interest at no greater rate than that fixed by the laws of Illinois. As usury was not pleaded by O'Neal, we shall not disturb in the account the discounts of his notes and the fifty dollars interest charged as of August 20; but we

are not convinced that O'Neal acquiesced in any of the charges of interest after that. These charges up to February 20, 1880, amounted to $875.76. The balance shown February 20, 1880, was $17,871.34, and $875.76 being deducted, leaves $16,995.58. Taking this as a basis, interest may be calculated on the average monthly balances after August 20, 1879, at the rate of six per cent, down to the date at which Dawson paid the balance due on his note into the bank, and then added to the principal sum. This will give the amount due to Hunter, Evans & Co. as of that date if they had received no payments thereon in the intermediate time.

The bank's debt should be ascertained as of the same date, namely, the date when Dawson paid the balance on his note into the bank, by adding the interest to O'Neal's note held by it of $9810.11, dated December 10, 1879, according to its terms.

The proportion of the fund to go to each of the debts so ascertained can then be arrived at. From the *pro rata* amount to come to Hunter, Evans & Co. should be deducted the payments of $1668.56, May 22, and $1842, June 22, and the sum of $110, July 17, and of $2424.56 as of July 20, with interest, and the balance of the *pro rata* amount should be decreed to be paid out of the money deposited by Dawson as of the date of such deposit, the bank retaining the remainder, and at the same time provision should be made for the production and cancellation of Dawson's note, the discharge of the sureties upon his forthcoming or replevin bond, and the payment of his claim in reconvention.

While the case was pending in the Circuit Court, John O'Neal died and the cause was revived as to Mary O'Neal, his administratrix.

She did not appeal, and the bank and Dawson petitioned the court to be allowed an appeal as between themselves and Hunter, Evans and Buel, the complainants, which was ordered by the court as to said two defendants, who perfected their appeal accordingly.

This was proper, as with the matters complained of by the bank and by Dawson, O'Neal's estate had no concern. The

total balance of the indebtedness due from that estate, after all payments and money realized were applied, would be the same, irrespective of the proportion of such balance found due to each of the two creditors. The decree was severable in fact and in law, and the bank and Dawson were entitled to prosecute their appeal without joining their codefendant, who did not think proper to question the judgment.

And while, in order to a correct distribution of the fund, it becomes necessary to find the indebtedness of O'Neal to Hunter, Evans & Co. and to the bank, this is not a determination of the amount remaining due after the distribution is made, with intent to a decree over against O'Neal's estate therefor, as the decree originally entered, so far as relates to that, stands unappealed from by either of the parties concerned.

*The decree of the Circuit Court is reversed, with costs, and the cause remanded with directions to proceed in conformity with this opinion.*