# WINTERS *v.* THE UNITED STATES.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 158. Argued October 24, 1907.—Decided January 6, 1908.

The rule that all the parties must join in an appeal or writ of error unless properly detached from the right so to do applies only to joint judgments and decrees. This court has jurisdiction of an appeal taken or writ of error sued out by one of several defendants if his interest is separaté from that of the other defendants.

In a suit against several defendants as trespassers in which some of them defaulted and others answered, *held*, that each defendant was a separate trespasser and that while those who defaulted were precluded from questioning the correctness of the decree entered against them, the answering defendants had nothing in common with the others and could maintain an appeal without them.

In a conflict of implications, the instruments must be construed according to the implication having the greater force; and, in the interpretation of agreements and treaties with Indians, ambiguities should be resolved from the standpoint of the Indians.

In view of all the circumstances of the transaction this court holds that there was an implied reservation in the agreement of May 1, 1888, 25 Stat. 124, with the Gros Ventre and other Indians establishing the Fort Belknap Reservation, of a sufficient amount of water from the Milk River for irrigation purposes, which was not affected by the subsequent act of February 22, 1889, 25 Stat. 676, admitting Montana to the Union, and that the water of that river cannot be diverted, so as to prejudice this right of the Indians, by settlers on the public lands or those claiming riparian rights on that river.

The Government of the United States has the power to reserve waters of a river flowing through a Territory and exempt them from appropriation under the laws of the State which that Territory afterwards becomes.

148 Fed. Rep. 684, affirmed.

THIS suit was brought by the United States to restrain appellants and others from constructing or maintaining dams or reservoirs on the Milk River in the State of Montana, or in any manner preventing the water of the river or its tributaries from flowing to the Fort Belknap Indian Reservation.

An interlocutory order was granted, enjoining the defendants in the suit from interfering in any manner with the use by the reservation of 5,000 inches of the water of the river. The order was affirmed by the Circuit Court of Appeals. 143 Fed. Rep. 740. Upon the return of the case to the Circuit Court, an order was taken *pro confesso* against five of the defendants. The appellants filed a joint and several answer, upon which and the bill a decree was entered making the preliminary injunction permanent. The decree was affirmed by the Circuit Court of Appeals. 148 Fed. Rep. 684.

The allegations of the bill, so far as necessary to state them, are as follows: On the first day of May, 1888, a tract of land, the property of the United States, was reserved and set apart "as an Indian reservation as and for a permanent home and abiding place of the Gros Ventre and Assiniboine bands or tribes of Indians in the State (then Territory) of Montana, designated and known as the Fort Belknap Indian Reservation." The tract has ever since been used as an Indian reservation and as the home and abiding place of the Indians. Its boundaries were fixed and defined as follows (25 Stat. 124):

"Beginning at a point in the middle of the main channel of Milk River, opposite the mouth of Snake Creek; thence due south to a point due west of the western extremity of the Little Rocky Mountains; thence due east to the crest of said mountains at their western extremity, and thence following the southern crest of said mountains to the eastern extremity thereof; thence in a northerly direction in a direct line to a point in the middle of the main channel of Milk River opposite the mouth of People's Creek; thence up Milk River, in the middle of the main channel thereof, to the place of beginning."

Milk River, designated as the northern boundary of the

reservation, is a non-navigable stream. Large portions of the lands embraced within the reservation are well fitted and adapted for pasturage and the feeding and grazing of stock, and since the establishment of the reservation the United States and the Indians have had and have large herds of cattle and large numbers of horses grazing upon the land within the reservation, "being and situate along and bordering upon said Milk River." Other portions of the reservation are "adapted for and susceptible of farming and cultivation and the pursuit of agriculture, and productive in the raising thereon of grass, grain and vegetables," but such portions are of dry and arid character, and in order to make them productive require large quantities of water for the purpose of irrigating them. In 1889 the United States constructed houses and buildings upon the reservation for the occupancy and residence of the officers in charge of it, and such officers depend entirely for their domestic, culinary and irrigation purposes upon the water of the river. In the year 1889, and long prior to the acts of the defendants complained of, the United States, through its officers and agents at the reservation, appropriated and took from the river a flow of 1,000 miners' inches, and conducted it to the buildings and premises, used the same for domestic purposes and also for the irrigation of land adjacent to the buildings and premises, and by the use thereof raised crops of grain, grass and vegetables. Afterwards, but long prior to the acts of the defendants complained of, to wit, on the fifth of July, 1898, the Indians residing on the reservation diverted from the river for the purpose of irrigation a flow of 10,000 miners' inches of water to and upon divers and extensive tracts of land, aggregating in amount about 30,000 acres, and raised upon said lands crops of grain, grass and vegetables. And ever since 1889 and July, 1898, the United States and the Indians have diverted and used the waters of the river in the manner and for the purposes mentioned, and the United States "has been enabled by means thereof to train, encourage and accustom large numbers of Indians residing upon the said reserva-

tion to habits of industry and to promote their civilization and improvement." It is alleged with detail that all of the waters of the river are necessary for all those purposes and the purposes for which the reservation was created, and that in furthering and advancing the civilization and improvement of the Indians, and to encourage habits of industry and thrift among them, it is essential and necessary that all of the waters of the river flow down the channel uninterruptedly and undiminished in quantity and undeteriorated in quality.

It is alleged that "notwithstanding the riparian and other rights" of the United States and the Indians to the uninterrupted flow of the waters of the river the defendants, in the year 1900, wrongfully entered upon the river and its tributaries above the points of the diversion of the waters of the river by the United States and the Indians, built large and substantial dams and reservoirs, and by means of canals and ditches and waterways have diverted the waters of the river from its channel, and have deprived the United States and the Indians of the use thereof. And this diversion of the water, it is alleged, has continued until the present time, to the irreparable injury of the United States, for which there is no adequate remedy at law.

The allegations of the answer, so far as material to the present controversy, are as follows: That the lands of the Fort Belknap Reservation were a part of a much larger area in the State of Montana, which by an act of Congress, approved April 15, 1874, c. 96, 18 Stat. 28, was set apart and reserved for the occupation of the Gros Ventre, Piegan, Blood, Blackfoot and River Crow Indians, but that the right of the Indians therein "was the bare right of the use and occupation thereof at the will and sufferance of the Government of the United States." That the United States, for the purpose of opening for settlement a large portion of such area, entered into an agreement with the Indians composing said tribes, by which the Indians "ceded, sold, transferred and conveyed" to the United States all of the lands embraced in said area, except Fort Belknap Indian Reservation,

described in the bill. This agreement was ratified by an act
of Congress of May 1, 1888, c. 213, 25 Stat. 113, and thereby
the lands to which the Indians' title was thus extinguished be-
came a part of the public domain of the United States and
subject to disposal under the various land laws, "and it was
the purpose and intention of the Government that the said
land should be thus thrown open to settlement, to the end that
the same might be settled upon, inhabited, reclaimed and cul-
tivated and communities of civilized persons be established
thereon."

That the individual defendants and the stockholders of the
Matheson Ditch Company and Cook's Irrigation Company were
qualified to become settlers upon the public land and to ac-
quire title thereto under the homestead and desert land laws
of the United States. And that said corporations were organ-
ized and exist under the laws of Montana for the purpose of
supplying to their said stockholders the water of Milk River
and its tributaries, to be used by them in the irrigation of their
lands.

That the defendant, the Empire Cattle Company, is a corpo-
ration under the laws of Montana, was legally entitled to pur-
chase, and did purchase, from those who were qualified to ac-
quire them under the desert and homestead land laws of the
United States, lands on the Milk River and its tributaries, and
is now the owner and holder thereof.

That the defendants, prior to the fifth day of July, 1898, and
before any appropriation, diversion or use of the waters of
the river or its tributaries was made by the United States or
the Indians on the Fort Belknap Reservation, except a pump-
ing plant of the capacity of about 250 miners' inches, without
having notice of any claim made by the United States or the
Indians that there was any reservation made of the waters
of the river or its tributaries for use on said reservation, and
believing that all the waters on the lands open for settlement
as aforesaid were subject to appropriation under the laws of
the United States and the laws, decisions, rulings and customs

of the State of Montana, in like manner as water on other portions of the public domain, entered upon the public lands in the vicinity of the river, made entry thereof at the United States land office, and thereafter settled upon, improved, reclaimed and cultivated the same and performed all things required to acquire a title under the homestead and desert land laws, made due proof thereof, and received patents conveying to them, respectively, the lands in fee simple.

That all of said lands are situated within the watershed of the river, are riparian upon the river and its tributaries, but are arid and must be irrigated by artificial means to make them inhabitable and capable of growing crops.

That for the purpose of reclaiming the lands, and acting under the laws of the United States and the laws of Montana, the defendants, respectively, posted upon the river and its tributaries, at the points of intended diversion, notices of appropriation, stating the means of diversion and place of use, and thereafter filed in the office of the clerk and recorder of the county wherein the lands were situated a copy of the notices, duly verified, and within forty days thereafter commenced the construction of ditches and other instrumentalities, and completed them with diligence and diverted, appropriated and applied to a beneficial use more than 5,000 miners' inches of the waters of the river and its tributaries, or 120 cubic feet per second, irrigating their lands and producing hay, grain and other crops thereon.  The defendants and the stockholders of the defendant corporations have expended many thousands of dollars in constructing dams, ditches and reservoirs, and in improving said lands, building fences, and other structures, establishing schools and constructing highways and other improvements, usually had and enjoyed in a civilized community, and that the only supply of water to irrigate the lands is from Milk River.  If defendants are deprived of the waters their lands cannot be successfully cultivated, and they will become useless and homes cannot be maintained thereon.

That there are other lands within the watershed of the

Milk River and its tributaries and dependent upon its waters
for irrigation upon which large numbers of persons have settled
under the land laws of the United States and are irrigating and
cultivating the same by means of said waters, and have assisted
the defendants "in establishing a civilized community in said
country and in building and maintaining churches, schools,
villages and other elements and accompaniments of civilization;
that said communities consist of thousands of people, and if
the claim of the United States and the Indians be maintained,
the lands of the defendants and the other settlers will be
rendered valueless, the said communities will be broken up
and the purpose and object of the Government in opening said
lands for settlement will be wholly defeated."

It is alleged that there are a large number of springs on the
reservation and several streams from which water can be ob-
tained for stock and irrigation purposes, and particularly these:
People's Creek, flowing about 1,000 inches of water; Big Horn
Creek, flowing about 1,000 inches; Lodge Pole Creek, flowing
about 600 inches of water; Clear Creek, flowing about 300
inches.    That all of the waters of these streams can be made
available for use upon the reservation, and that it was not the
intention of the Government to reserve any of the waters of
Milk River or its tributaries.    That the respective claims of the
defendants to the waters of the river and its tributaries are
prior and paramount to the claims of the United States and
the Indians, except as to 250 inches used in and around the
agency buildings, and at all times there has been sufficient
water flowing down the river to more than supply these 250
inches.

And it is again alleged that the waters of the river are in-
dispensable to defendants, are of the value of more than
$100,000 to them, and that if they are deprived of the waters
"their lands will be ruined, it will be necessary to abandon
their homes, and they will be greatly and irreparably damaged,
the extent and amount of which damage cannot now be esti-
mated, but will greatly exceed $100,000," and that they will

be wholly without remedy if the claim of the United States and the Indians be sustained.

*Mr. Edward C. Day* and *Mr. James A. Walsh* for appellants:
The decree is, in fact, separate and severable.

It is not charged that the defendants acted jointly. Neither one is responsible for the acts of the other. In so far as the record shows, the defaulting defendants are not the owners of any lands and are not interested in this suit. *Hancock* v. *Patrick*, 119 U. S. 156; *Forgay* v. *Conrad*, 6 How. 201; *Gilfillan* v. *McKee*, 159 U. S. 303; *City Bank* y. *Hunter*, 129 U. S. 578; *Milner* v. *Meek*, 95 U. S. 252; *Todd* v. *Daniel*, 16 Pet. 521; *Railroad Co.* v. *Johnson*, 15 Wall. 8; *Germain* v. *Mason*, 12 Wall. 261. See also *Hill* v. *Chicago and Evanston Ry. Co.*, 140 U. S. 52; *Basket* v. *Haskell*, 107 U. S. 602; *Louisville & N. A. C.* v. *Pope*, 74 Fed. Rep. 5; *Farmers' Loan & Trust Co.* v. *McClure*, 49 U. S. App. 146; *Mercantile Trust Co.* v. *Adams Express Co.*, 16 U. S. App. 37.

In the agreement with the Indians and the act of Congress, ratifying that agreement, there was no reservation of the waters of Milk River or its tributaries for use on the Fort Belknap Indian Reservation. Nor can it be held that the Indians understood that there was any reservation of the waters of Milk River for use upon the Belknap Reservation, or that they ceded and relinquished to the Government anything less than the absolute title to the lands and all waters thereon to that portion of the former reservation to which they relinquished their claims.

The rule that the treaty must be construed most favorably to the Indians does not apply to this case. Here the controversy is between the United States, as guardian of the Indians, and the appellants who are citizens and grantees of the United States, and the controversy has reference to the titles granted by the United States to them. In such case, the appellants are the public in whose behalf the grants must be construed most strongly. The property granted to them by their

entry upon and settlement of the public lands of the United States, and the appropriation of the waters flowing in the streams upon or adjacent thereto pursuant to the laws, decisions of the courts, rules and customs of the country, is property of which they cannot be deprived without due process of law, and without just compensation.

There is nothing before the court for construction or interpretation, but the plain, unambiguous language of the agreement, and that is so clear that it does not require any construction or interpretation.

The appellants made valid appropriations of the waters of Milk River and its tributaries under the laws, customs and decisions of Montana, and the laws of Congress, and their rights as grantees of the Government are superior to any rights which the Indians may have by reason of the agreement entered into between them and the Government.

The doctrine of riparian rights is not recognized, does not prevail and never was in force in Montana, and the rights of the parties to the use of the waters of Milk River and its tributaries must be construed according to the laws of this State.

Even if the doctrine of riparian rights did prevail, the appellants would be entitled to a reasonable use of the water for the purpose of irrigating their lands, having in view the equitable rights of others.

The right to appropriate water is recognized by the laws of the United States, the laws and decisions of the courts and the customs prevailing in Montana, which are now and were in force in Montana at the time the agreement was made with the Indians, and these appellants have shown that they acquired title to their lands under the grant from the Government and made valid and prior appropriations of the waters to reclaim such lands.

*Mr. Assistant Attorney General Sanford* and *Mr. Assistant Attorney General Van Orsdel,* with whom *The Solicitor General*

and *Mr. A. C. Campbell,* Special Attorney, were on the brief, for appellee:

The decree below adjudging the complainants' right to the flow of the waters of Milk River as against all of the defendants before the court, is a joint decree within the meaning of the rule that all parties against whom a joint judgment or decree is rendered must join in prosecuting a writ of error or appeal, and that if prosecuted by less than the whole number of such parties, without a summons and severance or other equivalent proceeding, the appellate court acquires no jurisdiction of the case and the writ of error or appeal will be dismissed. *Owings* v. *Kincannon,* 7 Pet. 399; *Masterson* v. *Herndon,* 10 Wall. 416; *Hampton* v. *Rouse,* 13 Wall. 187; *Wilson's Heirs* v. *Insurance Co.,* 12 Pet. 140.

The defect of lack of jurisdiction for want of necessary parties to the appeal was not waived by the final decree entered by the Circuit Court of Appeals upon the merits without objection on that ground. *Union & Planters Bank* v. *Memphis,* 189 U. S. 71, 73.

Under the just and reasonable construction of this agreement with the Indians, considered in the light of all the circumstances and of its express purpose, the Indians did not thereby cede or relinquish to the United States the right to appropriate the waters of Milk River necessary to their use for agricultural and other purposes upon the reservation, but retained this right, as an appurtenance to the land which they retained, to the full extent in which it had been vested in them under former treaties, and the right thus retained and vested in them under the agreement of 1888, at a time when Montana was still a Territory of the United States, could not be divested under any subsequent legislation either of the Territory or of the State.

While the United States may itself abrogate rights granted to the Indians under a treaty with them, it alone has this power, and unless such rights are abrogated by the United States itself by subsequent legislation it is well settled that all

rights acquired by the Indians under the treaty are to be fully protected against invasion by other parties. *The Cherokee Nation v. Georgia,* 5 Pet. 1; *United States v. Cook,* 19 Wall. 591.

Mr. Justice McKenna, after making the foregoing statement, delivered the opinion of the court.

A question of jurisdiction is presented by the United States. Five of the defendants named in the bill failed to answer and a decree *pro confesso* was taken against them. The other defendants, appellants here, after the affirmance by the Circuit Court of Appeals of the interlocutory injunction, filed a joint and several answer. On this answer and the bill the case was heard and a decree entered against all of the defendants. From that decree the appellants here appealed to the Circuit Court of Appeals without joining therein the other five defendants. The contention is that the Circuit Court of Appeals had no jurisdiction and that this court has none, because the five defaulting defendants had such interest in the case and decree that they should have joined in the appeal, or proceedings should have been taken against them in the nature of summons and severance or its equivalent.

The rule which requires the parties to a judgment or decree to join in an appeal or writ of error, or be detached from the right by some proper proceeding, or by their renunciation, is firmly established.[1] But the rule only applies to joint judgments or decrees.[2] In other words, when the interest of a de-

---

[1] *Williams v. Bank of United States,* 11 Wheat. 414; *Owings v. Kincannon,* 7 Pet. 399; *Heirs of Wilson v. Insurance Company,* 12 Pet. 140; *Mussina v. Cavozos,* 6 Wall. 355; *Masterson v. Herndon,* 10 Wall. 416; *Hampton v. Rouse,* 13 Wall. 187; *Simpson v. Greeley,* 20 Wall. 152; *Feibelman v. Packard,* 108 U. S. 14; *Estis v. Trabue,* 128 U. S. 225, 230; *Mason v. United States,* 136 U. S. 581; *Dolan v. Jennings,* 139 U. S. 385; *Hardee v. Wilson,* 146 U. S. 179; *Inglehart v. Stansbury,* 151 U. S. 68; *Davis v. Mercantile Trust Company,* 152 U. S. 590; *Beardsley v. Railway,* 158 U. S. 123, 127; *Wilson v. Kiesel,* 164 U. S. 248.

[2] *Todd v. Daniel,* 16 Pet. 521, 523; *Germain v. Mason,* 12 Wall. 259; *Forgay v. Conrad,* 6 How. 201; *Brewster v. Wakefield,* 22 How. 118, 129; *Milner v. Meek,* 95 U. S. 252; *Basket v. Hassell,* 107 U. S. 602, 608; *Hanrick*

fendant is separate from that· of other defendants he may appeal without them. Does the case at bar come within the rule? The bill does not distinguish the acts of the defendants, but it does not necessarily imply that there was between them, in· the diversion of the waters of Milk River, concert of action or·union of interest. The answer to·the bill is joint and several, and in ·effect avers separate rights, interests and action on the ·part of the defendants. In other words, whatever rights were asserted or admission of acts done by any one defendant had no dependence upon or relation to the acts of any other defendant in the appropriation or diversion of the water. If trespassers at all, they were separate trespassers. Joinder in one suit did not necessarily identify them. Besides, the defendants other than appellants defaulted. A decree *pro confesso* was entered against them, and. thereafter, according to Equity Rule 19, the cause was required to proceed *ex parte* and the matter of the bill decreed by the court. *Thomson* v. *Wooster*, 114 U. S. 104. The decree was in due course made absolute, and granting that it might have been appealed from by the .defaulting defendants, they would have been, as said in *Thomson* v. *Wooster*, absolutely barred and precluded from questioning its correctness, unless on the face of the bill it appeared ·manifest that it was erroneous and improperly granted. Their rights, therefore, were entirely different from those of the appellants; they were naked trespassers, and conceded by their·default the rights of . the United States and the Indians, and were in no position to resist the prayer of the bill. But the appellants justified by counter rights and submitted those rights for judgment. There is nothing, therefore, in common between appellants and the other defendants. The motion to dismiss is denied and we proceed to the merits.

The case, as we view it, turns on the agreement of May, 1888, resulting in the creation of Fort Belknap Reservation. In the construction of this agreement there are certain elements to

v. *Patrick*, 119 U. S. 156; *City Bank* v. *Hunter*, 129 U. S. 557; *Gilfillan* v. *McKee*, 159 U. S. 303.

be considered that are prominent and significant. The reservation was a part of a very much larger tract which the Indians had the right to occupy and use and which was adequate for the habits and wants of a nomadic and uncivilized people. It was the policy of the Government, it was the desire of the Indians, to change those habits and to become a pastoral and civilized people. If they should become such the original tract was too extensive, but a smaller tract would be inadequate without a change of conditions. The lands were arid and, without irrigation, were practically valueless. And yet, it is contended, the means of irrigation were deliberately given up by the Indians and deliberately accepted by the Government. The lands ceded were, it is true, also arid; and some argument may be urged, and is urged, that with their cession there was the cession of the waters, without which they would be valueless, and "civilized communities could not be established thereon." And this, it is further contended, the Indians knew, and yet made no reservation of the waters. We realize that there is a conflict of implications, but that which makes for the retention of the waters is of greater force than that which makes for their cession. The Indians had command of the lands and the waters—command of all their beneficial use, whether kept for hunting, "and grazing roving herds of stock," or turned to agriculture and the arts of civilization. Did they give up all this? Did they reduce the area of their occupation and give up the waters which made it valuable or adequate? And, even regarding the allegation of the answer as true, that there are springs and streams on the reservation flowing about 2,900 inches of water, the inquiries are pertinent. If it were possible to believe affirmative answers, we might also believe that the Indians were awed by the power of the Government or deceived by its negotiators. Neither view is possible. The Government is asserting the rights of the Indians. But extremes need not be taken into account. By a rule of interpretation of agreements and treaties with the Indians, ambiguities occurring will be resolved from the standpoint of the Indians. And the rule

should certainly be applied to determine between two inferences, one of which would support the purpose of the agreement and the other impair or defeat it. On account of their relations to the Government, it cannot be supposed that the Indians were alert to exclude by formal words every inference which might militate against or defeat the declared purpose of themselves and the Government, even if it could be supposed that they had the intelligence to foresee the "double sense" which might some time be urged against them.

Another contention of appellants is that if it be conceded that there was a reservation of the waters of Milk River by the agreement of 1888, yet the reservation was repealed by the admission of Montana into the Union, February 22, 1889, c. 180, 25 Stat. 676, "upon an equal footing with the original States." The language of counsel is that "any reservation in the agreement with the Indians, expressed or implied, whereby the waters of Milk River were not to be subject of appropriation by the citizens and inhabitants of said State, was repealed by the act of admission." But to establish the repeal counsel rely substantially upon the same argument that they advance against the intention of the agreement to reserve the waters. The power of the Government to reserve the waters and exempt them from appropriation under the state laws is not denied, and could not be. *The United States* v. *The Rio Grande Ditch & Irrigation Co.*, 174 U. S. 690, 702; *United States* v. *Winans*, 198 U. S. 371. That the Government did reserve them we have decided, and for a use which would be necessarily continued through years. This was done May 1, 1888, and it would be extreme to believe that within a year Congress destroyed the reservation and took from the Indians the consideration of their grant, leaving them a barren waste—took from them the means of continuing their old habits, yet did not leave them the power to change to new ones.

Appellants' argument upon the incidental repeal of the agreement by the admission of Montana into the Union and the power over the waters of Milk River which the State thereby acquired

to dispose of them under its laws, is elaborate and able, but our construction of the agreement and its effect make it unnecessary to answer the argument in detail. For the same reason we have not discussed the doctrine of riparian rights urged by the Government.

*Decree affirmed.*

MR. JUSTICE BREWER dissents.